[No. 30471. Department Two. December 7, 1948.]

FRANCIS M. LEROUX, *Appellant*, v. MARGARET L. EDWARDS, *Respondent*.[1]

*Charles Snyder* and *Judd D. Kimball*, for appellant.

*Herbert Ringhoffer*, for respondent.

SIMPSON, J.—The purpose of the action instituted by plaintiff was to recover the sum of fifty thousand dollars claimed to be due for personal services rendered by him to the defendant. Plaintiff alleges that between the first day of February, 1943, and the fifteenth day of December, 1945, he performed services as manager and operator of defendant's wheat ranch, and his efforts were worth fifty thousand dollars. The material portion of his complaint

[1] Reported in 200 P. (2d) 502.

relative to the agreement between himself and the defendant reads:

"That defendant, on or about the 1st day of February, 1943, orally agreed with the plaintiff to compensate the plaintiff in a reasonable amount, such amount to be determined from the profits derived from the said ranch operations; . . ."

Defendant's answer contained a formal denial of the allegations contained in the plaintiff's complaint.

The action, tried to the court, resulted in the entering of a judgment favorable to defendant.

On his appeal, plaintiff assigns as error on the part of the trial judge (1) in holding that plaintiff was not entitled to the reasonable value of his services, and (2) in holding that certain records were of no value.

We state the essential evidence as follows: Appellant, whose wife, Miriam, died on August 13, 1943, is the son-in-law of respondent. Respondent owned a 5,400-acre wheat ranch in Walla Walla county. February 1, 1943, appellant took over the management of respondent's farm.

Appellant testified that he talked with respondent on many occasions touching her farming activities. He asked on what basis he "could take it over." She advised him about her financial condition, and he examined her bank checks and statements. He made an analysis of respondent's financial condition and farming operations. The analysis showed that she was losing money. He told her he would go ahead with the farm work, though he did not have any definite agreement concerning his compensation. His evidence relative to the contract was to the effect that he didn't expect to have compensation except that reflected in the profit over and above previous production on the farm. He stated:

"Q. What do you place as a reasonable value for your services? A. To myself for what I produced over what they originally started out on? . . . A. Half of whatever I made over what she would have gotten by renting, I made approximately $90,000.00 more and that would be approximately $47,500.00."

The situation existing just after the death of Mrs. Le-Roux is best explained in the testimony of respondent when she stated:

"We were all grief stricken. Frank was grieving. There were two little babies. Frank came to my house a certain few days carrying Maurill, that is the oldest child,—the little baby would be about six weeks old at that time. He said he and Marion had always wanted to help me. That was not working out. He asked if I would help him. I asked if he cared to live at the house. It wasn't properly built for two families. There was one bathroom. It wasn't a suitable place. I had asked Marion if she had given any further consideration to the Baumister place a few days before Marion's death 'It doesn't hurt to dream'. Marion made that comment to me. We decided we would try to do that thing. Frank said if I would attempt to help him he would attempt to help me. That was the way it was. It was quite a big problem. There was a lot to do and there was real shock and grief."

Respondent's version of the business relation between herself and appellant, aside from that already mentioned, is as follows: There was no agreement made to pay appellant, and whatever he tried to do was in the nature of a free-will offering as a member of the family. In order to care for appellant and his children, respondent purchased a large home in which the parties lived until December, 1945. Although appellant was not a farmer, he had considerable business ability. Many acres of the farm used as pasture were brought under cultivation by him, and the production of livestock was increased. In 1943, the farm earned $23,673.94. In 1944, the earning was $26,502. And in 1945, the profit was $36,859.99. The estimated income for 1946 was $40,000.

During the time appellant was on the farm, he conducted its activities and attended to the banking business. During a three-year period, appellant compiled the figures and data from which respondent's income tax returns were made. The returns, however, did not indicate any debt, charge, or expense occasioned by his management. In fact, he never claimed that any pay was due him until he brought this action.

The appellant was taking part in the management of respondent's farm and spending her money, for which he never accounted. He purchased a farm near hers and then commingled his labor account with hers, and his bills for repairs, parts, and supplies with her bills. He did custom farming with her machinery and retained the profits. He did not account for the proceeds from the sale of her chickens, eggs, or hogs. He stored grain other than her own in her storage bins, and placed her grain in a public warehouse. Appellant divided his time between the management of respondent's farm and of his grocery store.

In deciding the case, the trial court stated:

"Who is the Court to believe? Frank LeRoux says there was an implied agreement, but it was not answered. All right, we have Mrs. Edwards' testimony. The family had many conferences over the farm and never was there a conversation about pay. The daughter, Marjorie, testified about these conversations. She denied that there was any discussion as to compensation. Who is the Court to believe about that verbal contract? The strongest evidence of that is circumstantial evidence."

The trial court then carefully analyzed all the evidence introduced during the trial. In doing so, he called attention to the slip-shod manner in which appellant kept his accounts and those of respondent. He also called attention to all of the details of the management as shown by the evidence of the respective parties.

The law applying to a case such as the one at bar is well stated in the following language in *Morrissey v. Faucett*, 28 Wash. 52, 68 Pac. 352:

"It is a rule universally recognized that, when the services are rendered by one who is a member of the family of the employer, the law will not imply a contract to pay for the services from the mere fact that they have been rendered upon the one hand and benefits thereof received upon the other, as in the case of strangers. This is also held to be the rule when there is no actual blood relationship existing between the parties, provided they sustain to to each other the ordinary relations of members of the same family. It has been held, however, that when the family relationship exists it is not necessary to prove the

terms of a direct and positive contract, but that proof may be made of words, acts, and conduct of the parties, and circumstances from which the inference may follow that there was an understanding that the services were not to be rendered gratuitously; that when such is the case there is a contract upon which the value of the services can be recovered, and it is for the jury to say, from all the conduct of the parties and from the circumstances in evidence, whether there was in fact such an understanding or agreement."

This case was cited with approval in *Pelton v. Smith*, 50 Wash. 459, 97 Pac. 460.

■ A study of the relationship existing between appellant and respondent reveals that there was a family relationship. At first, appellant and his wife were interested in respondent's farm and desired to assist her. Later, when Mrs. LeRoux died and left her husband with two very small children, it was but natural that he would appeal to his mother-in-law to assist in keeping her grandchildren. It was for their mutual benefit that they decided to secure a large home in which appellant and respondent might live, and where the children could be brought up. The actions of the parties indicate that appellant wanted to assist respondent in the management of her farm, and respondent desired to aid in the care of her grandchildren.

After taking charge of the farm, appellant conducted its affairs as though it belonged to him. He commingled the labor account with his own. He did not keep any understandable set of account books that had to do with the farm. True, he did keep the checks and the bank statements, but he did not mark the checks in a way to indicate their purpose. The bank statements only showed the deposits made and the accounts withdrawn, with no information of the source of the amount deposited, nor of the purpose for which the checks were issued.

The most convincing evidence supporting the trial court's judgment is the fact that, in making up the statement for use by the accountant in computing respondent's income tax returns, appellant did not charge as an expense any amounts due him as the manager of the wheat farm.

Considering all of the evidence as reflected in the record before us, we conclude that appellant and respondent did not enter into any contract such as alleged and testified to by appellant. We hold with the trial court that appellant and respondent were engaged in a mutual benefit enterprise. He managed her farm. She maintained a home for him and his children.

The judgment of the trial court was correct, and it is therefore affirmed.

MALLERY, C. J., HILL, ROBINSON, and SCHWELLENBACH, JJ., concur.